[Civ. No. 11697. First Dist., Div. One. Aug. 27, 1941.]

R. Y. HANLON et al., Plaintiffs and Appellants, v. WEST-
ERN LOAN & BUILDING COMPANY (a Corpora-
tion), Respondent; THOMAS D. AITKEN et al., Cross-
Defendants and Appellants.

Thos. D. Aitken, *in pro. per.,* for Appellants.

Tobin & Tobin and Charles R. Collins for Respondent.

PETERS, P. J.—R. Y. Hanlon and Martha G. Hanlon, his wife, Thomas D. Aitken individually and as executor of the will of Alice J. Neal, and Harold E. Haven as trustee for Alice J. Neal, appeal from a judgment in favor of defendant and cross-complainant Western Loan & Building Company reforming certain instruments under which the loan company claims title to certain real property, and quieting its title to such property. The same parties also appeal from a special order made after final judgment approving the accounts of a receiver appointed by the trial court.

The action was commenced by the Hanlons against the loan company to quiet their title to a piece of improved property at 1350 Turk Street, in San Francisco. The loan company cross-complained naming as cross-defendants not only the Hanlons but also Thomas D. Aitken and Marian N. Aitken, his wife, Alice J. Neal and Harold E. Haven and others, requesting that certain documents by which it claimed title to the real property at 1350 Turk Street be reformed to set forth the true description of the property, and that its title be quieted as against the cross-defendants not only to the property at 1350 Turk Street, but also as to property located at 1340 Turk Street. The judgment reformed the various instruments as requested by respondent, and quieted its title to both parcels. Appellants assert no title to the property at 1340 Turk Street, but do contend, among many other things, that it was error to quiet title by means of a cross-complaint to property not included in the original complaint.

Both parcels of property were originally owned by a contractor by the name of J. D. Hannah who had constructed an apartment building on each parcel. The Western Loan & Building Company held several promissory notes of Hannah, including one for $33,000 secured by a first mortgage on the property at 1340 Turk Street, and another for $33,000 secured by a first mortgage on the property at 1350 Turk Street. There were also second liens on both parcels, which liens were held by another company. Early in 1930 the holder of the second liens caused the two parcels to be sold under its deeds of trust. One Murphy purchased the two parcels at the trustees' sales. Murphy's title, which as to each parcel was, of course, subject to the $33,000 note and mortgage on each parcel held by the loan company, was purchased by Thomas D. Aitken, an attorney at law. Aitken had been Hannah's attorney, but he admittedly purchased the properties on his own account.

Before Aitken purchased the properties Hannah was having difficulties with the loan company, not only over the two loans on the Turk Street properties, but on some five or six other loans made by that company to him. These difficulties, and difficulties with his other creditors, finally resulted in involuntary bankruptcy proceedings. Hannah had instituted an action in the federal court against the loan company to recover alleged usurious interest and penalties on the various loans made by that company to him. When Aitken bought the two Turk Street parcels he intervened in the usury action, seeking a determination that the provision for interest in each of the two mortgages was void.

Hannah, during this period, was negotiating with the loan company through its Northern California manager, C. H. McEntyre, for a large loan on other property, seeking to rehabilitate himself and to get back into business. Many conferences were had between McEntyre, Aitken and Hannah in which various propositions were discussed. Hannah was apparently somewhat disturbed over the fact that his attorney Aitken had purchased for his own account the title of the Turk Street properties. The loan company was insisting that before any further loans could be made to Hannah, the Turk Street loans had to be cleared up. In November of 1930 a settlement was agreed upon. On November 18, 1930, Aitken and his wife signed two notes for $33,000 each, payable to

the loan company, each note being secured by a first deed of trust on one of the Turk Street parcels. The usury actions were dismissed. As part of the same transaction Aitken signed a "Receipt and Satisfaction" acknowledging that "all differences existing between WESTERN LOAN & BUILDING COMPANY, a corporation, and C. H. McENTYRE on the one hand, and myself on the other hand, from time immemorial to the present time have been fully and completely adjusted and that all claims of whatsoever nature that I may have against the said Western Loan & Building Company, a corporation, and C. H. McEntyre are hereby settled and the new obligation incurred simultaneously with the signing hereof is free from taint of usury, duress or undue influence and is in consideration of the full amount of the obligation expressed therein." The loan company guaranteed that no deficiency judgment would be taken against the Aitkens on either of the two notes and deeds of trust. A document waiving a deficiency judgment was subsequently executed by the loan company. As part of the same transaction, and as additional security for the two notes, the Aitkens executed assignments of the rent of the apartments located on each parcel to the loan company, and chattel mortgages on the furnishings in each building. As part of the same transaction the Hannah mortgages were released of record.

Thereafter, on September 22, 1931, the loan company recorded notices of default under both deeds of trust, the Aitkens then being in default on both obligations, and at the trustees' sales purchased both parcels. By virtue of these sales, it claims that it is the owner in fee of both parcels, and the trial court so found.

There is no controversy over the fact that by such purchase the loan company became the owner of the parcel known as 1340 Turk Street. Appellants claim, however, that the loan company never became the owner of the parcel known as 1350 Turk Street because the property was incorrectly described in the deed of trust on that property, and was incorrectly described in the notice of breach and election to sell filed by the loan company. They urge that, prior to the sales, Mrs. Neal purchased 1350 Turk Street without actual or constructive notice of the Aitken deed of trust. They contend, therefore, that the deed of trust was void, and that all proceedings in connection with the sale were void, and that the

loan company has not a good or valid title to that parcel, and that the trial court erroneously reformed the documents, and erroneously quieted the loan company's title to that parcel.

The deeds of trust executed by Aitken and his wife in favor of the loan company were prepared by employees of the loan company, apparently at its home office in Salt Lake City. The deed of trust covering the parcel at 1350 Turk Street described the property conveyed to the trustee as ''all that property in the County of Alameda, State of California, particularly described as follows, to-wit: . . . '' There then follows an accurate, complete, detailed and legal description of the property, except that no reference is made to the fact that the property was located in San Francisco. This deed of trust was recorded in San Francisco on January 9, 1931. The loan company, the Aitkens, and the title insurance company involved, were then ignorant of the mistake in the description. In the assignment of the rents of the apartment house at 1350 Turk Street, San Francisco, executed the same day as the deed of trust, the property is described as ''those certain premises in San Fran. County, State of . . . '' together with a proper legal description of the property. This assignment recites the fact that these premises are subject to a $33,000 note and deed of trust held by the loan company which deed of trust is of record ''in the Office of the County Recorder of said County.'' This assignment was also recorded in San Francisco on January 9, 1931.

The chattel mortgage on the furnishings of the property at 1350 Turk Street, San Francisco, fails to state in what city or county the furnishings mortgaged are located, but contains an otherwise complete legal description of the premises. It refers to the outstanding deed of trust and note and contains a copy of the Aitken note. This document was also recorded in San Francisco on January 9, 1931.

The notice of breach and election to sell under the deed of trust, which was recorded in San Francisco, on September 22, 1931, refers to the Aitken deed of trust ''recorded in Liber 2148 Page 73 of Official Records in the Recorder's Office of San Francisco County, California, and covering the following described property in San Francisco, Alameda County, California.'' Then follows a detailed, proper, legal description of the premises. The notice of sale, properly

published and posted in San Francisco, contained a proper description of the premises, expressly stating that the property was located in San Francisco. The trustee's deed to the loan company, which was recorded on January 26, 1932, properly described the property as being located in San Francisco.

It is the documents wherein the property is incorrectly described that the loan company sought by its cross-complaint to have reformed to correctly describe the property. The trial court granted this relief.

The major contention on this appeal is that plaintiffs Hanlon and wife acquired the premises at 1350 Turk Street from Alice J. Neal; that Mrs. Neal was a *bona fide* purchaser from the Aitkens; that she took the premises free of the lien of the loan company; that she had no notice, actual or constructive, of the lien of the loan company; that recordation of the deed of trust did not give her constructive notice because of the error in the description in the deed of trust.

Before describing the transactions by which Mrs. Neal and the Hanlons secured their deeds to the property it should be pointed out that appellants frankly concede that they make no pretense that the Hanlons were purchasers without notice. They admit that, when the Hanlons took their deed from Mrs. Neal, they knew of the existence of the deed of trust between the Aitkens and the loan company, or at least had knowledge of facts sufficient to put them under a duty of inquiry. They do contend, however, that the Hanlons are entitled to succeed as successors to Mrs. Neal, who, they contend, was a purchaser in good faith without notice. The evidence demonstrates that the Hanlons were mere dummies either for Mrs. Neal or for Aitken. It should also be mentioned that Mrs. Neal died before judgment was rendered in this case. By her will she bequeathed the residue of her estate, including necessarily any interest she might have had in 1350 Turk Street, to Thomas D. Aitken, Jr., son of Thomas D. Aitken, Sr., maker of the deed of trust in favor of the loan company. Aitken, Sr., was named as executor. The real party in interest on this appeal is Aitken, Jr., as legatee under the will of Mrs. Neal. Thomas D. Aitken, Sr., represents appellants on this appeal.

What is the basis of the claim of Mrs. Neal? Mrs. Neal was about seventy-three years of age when the transaction occurred by which it is now claimed she secured good title

as a *bona fide* purchaser. She was ill and had been confined to her room for some time. She testified in her deposition (she was too ill to attend the trial) that she had known Aitken for many years; that he handled all of her business transactions; that she had perfect confidence in him. Clearly, Aitken was her attorney, confidant and business adviser. The relationship was such that in her will she referred to Aitken, Sr., as "my friend of forty years standing . . . whom I have regarded as a son," and by that will bequeathed her entire estate to Aitken, Jr.

The notice of breach and election to sell is dated September 17, 1931, and was recorded in San Francisco on September 22, 1931. Sometime in October, 1931, Aitken, Sr., became aware of the fact that such notice had been filed. He testified that he knew that this notice referred to the property at 1350 Turk Street, San Francisco. At about this time he conceived the plan of deeding the property to some person who could claim to be a *bona fide* purchaser without notice of the loan company's deed of trust. In this way he hoped to be able to defeat the loan company's deed of trust. Pursuant to this plan, on December 29, 1931, he and his wife executed a grant, bargain and sale deed to Alice J. Neal, conveying the premises at 1350 Turk Street to her. This deed was recorded in San Francisco on January 6, 1932. Under date of January 2, 1932, Mrs. Neal executed a grant, bargain and sale deed to the premises to the Hanlons. This deed was recorded January 7, 1932. Both deeds were prepared in Aitken's office, and all details of the transactions were handled by the Aitken office. Hanlon gave Mrs. Neal a promissory note for $45,000, purportedly in payment of the purchase price of the property, but, admittedly, that note was merely part of the general plan of Aitken to have the Hanlons act as dummies for Mrs. Neal in the transaction. The case turns upon the question of whether Mrs. Neal was a *bona fide* purchaser. Aitken testified that at the time he and his wife deeded the property to Mrs. Neal he was indebted to her in an amount exceeding $17,000 on account of funds sent to him for her account from Manila, and which she permitted him to use as a loan. He testified, and Mrs. Neal corroborated him, that the property had been deeded to Mrs. Neal in return for her promise to cancel $15,000 of this indebtedness. No documents evidencing this

cancellation were ever executed. Mrs. Neal testified that she had no knowledge of the size, income, or value of the apartment she purchased. Neither the manager nor anyone else connected with the apartment was notified of the alleged change of ownership. Subsequently, a receiver was appointed to care for the apartment. He testified that in September of 1932 he had a conversation with Mrs. Neal in which she stated she had no interest in the property.

█ Aitken testified that he deliberately did not tell Mrs. Neal about the loan company's deed of trust on the property; that the whole scheme was worked out by him for the purpose of defeating the lien of the loan company. As justification for his actions he testified that the original note signed by him and his wife had been secured by the fraud of the loan company; that as part of the settlement by which the usury suits were dismissed and he signed the notes and gave the deeds of trust on the two Turk Street parcels, McEntyre of the loan company had promised, orally, to pay the legal firm of Aitken & Aitken $1,500, and had promised to lend Hannah $90,000 on a piece of property in San Francisco, the exact location of which is not clear; that he had signed the notes largely to rehabilitate Hannah. Admittedly, the loan company never signed any agreement to this effect. McEntyre unequivocally denied the conversations testified to by Aitken. Aitken testified that he trusted the loan company and so did not get anything in writing. On the other hand, he also testified that he did not trust McEntyre and during many of his telephone conversations with him he had an associate listen in on an extension—yet he never secured any writing embodying the alleged agreement, and signed a complete release on the date he executed the notes. He explained that the reason he signed the release, even though he claimed $1,500 was due from the loan company as attorney's fees, was that the fees were due the firm of Aitken & Aitken, and that in signing the release as an individual he did not think that that affected the partnership claim. Obviously, the credibility of these two witnesses was a matter for the trial court. It must be held that the finding of the trial court that there was no fraud on the part of the loan company is amply supported by credible substantial evidence.

█ Aitken also explained that another reason why he conceived the Aitken-Neal-Hanlon transactions was that in July of 1931 he had a conversation with a Mr. Moore, a col-

lector for the loan company; that at that time he, Aitken, was in default in interest and taxes; that Moore promised him that if he would agree to having the rents from the apartment turned directly over to the loan company that company would not take a default; that he notified the manager of the apartment by letter to turn the rents over to the loan company; that when he discovered that the loan company had recorded a notice of breach and election to sell on September 22, 1931, he was very angry at the company's breach of faith, and thereafter conceived and put into effect the plan above-described. He states that he felt justified in thus attempting "to get even financially" with the loan company; that it was just a case of "the biter getting bitten."

Moore denied making any such promises to Aitken. McEntyre testified that he had never authorized such a proposition. Although Aitken had testified that he did not trust the loan company, and, according to his own story, by July of 1931 knew the loan company had violated its promises to pay the fee and to finance Hannah, nevertheless, he made no attempt to secure from Moore a written agreement not to take a default, and did not mention the supposed agreement in his correspondence with the loan company. Under these circumstances, the credibility of these two witnesses was a matter entirely within the power of the trial court. Certainly, to say the least, there is credible, substantial evidence to support the finding of the trial court that no such agreement was ever made by Moore.

Aitken admitted in his testimony that when he "sold" the property to Mrs. Neal he did not tell her of the income of the property, nor that there were several thousands of dollars in back taxes due on the property. He conceded that no title report or other search of the title was made by, or on behalf of, Mrs. Neal, and contended that he never told her about the title. He placed a value on 1350 Turk Street of $45,000— yet he sold the premises as he believed free and clear of all encumbrances for a cancellation of the $15,000 loan made by Mrs. Neal to him. He explained that he had a vague indefinite understanding with her that if she sold the property, or if Hanlon exchanged it for her, and, if she received $45,000 from the sale, that then she was to reimburse him in some indefinite amount.

The trial court found the facts substantially as above set forth, and further found that the misdescription in the deed

of trust and notice of breach were caused by accident and mistake; that Alice J. Neal, the Hanlons and the other cross-defendants had notice of the Aitken deed of trust and of the notice of breach when the Aitken-Neal, Neal-Hanlon deeds were executed; that, to make the deed of trust and notice of breach conform to the intent of the parties, it is necessary and proper that they be reformed. It is further found that the Aitken-Neal deed was made without consideration; that Mrs. Neal was not a *bona fide* purchaser; that she never became the beneficial owner but was simply the nominal owner of the property as the representative of the Aitkens; that Aitken was the attorney, agent and confidant of Mrs. Neal; that the Hanlons had actual notice of the Aitken deed of trust when they accepted the deed from Mrs. Neal; that the Hanlons paid no consideration for the deed; that the Hanlon deed was executed for the convenience and in furtherance of the purposes of the Aitkens; that the Aitken-Neal-Hanlon transactions did not divest the Aitkens of title to the property. The court also found that, in addition to actual knowledge, Mrs. Neal and the Hanlons had constructive knowledge of the Aitken deed of trust, and had knowledge of sufficient facts to place upon them a duty of inquiry; that if inquiry had been made the Aitken deed of trust would have been discovered; that the loan company made none of the promises testified to by Aitken as an inducement to secure the loan; that the mistake of the scrivener or typist who prepared the Aitken deed of trust in describing the property, which mistake was partially carried over into the notice of breach, was a mutual mistake and not in accordance with the agreement and intention of the parties. By its judgment the court ordered that the Aitken deed of trust and the notice of breach be reformed to set forth the correct description of the property at 1350 Turk Street, San Francisco, and quieted the title of the loan company to that parcel, and also as to 1340 Turk Street.

Appellants have filed an opening brief totaling 240 pages. They there attack the pleadings of the loan company, the judgment on its merits, and make innumerable objections to the findings of the trial court. Many of the points urged are discussed and argued three different times in different places in the brief. In discussing the facts appellants frequently fail to give the required transcript references. Facts are stated as established facts that are directly contradicted,

and found, contrary to the facts stated by appellants. No useful or necessary purpose would be served in reviewing and discussing all of the points urged by appellants. To do so would unduly extend this already long opinion. All important issues presented on this appeal can be determined by a discussion of the following major points:

## Was Mrs. Neal a bona fide purchaser?

Appellants' whole case is constructed around the contention that Mrs. Neal was a *bona fide* purchaser without notice of the Aitken deed of trust. Aitken testified that he did not tell her of the deed of trust, and Mrs. Neal testified that she had no knowledge of the deed of trust. Both testified that Mrs. Neal had canceled $15,000 of a larger indebtedness owed to her by Aitken in payment for the property. Both admitted that, had Mrs. Neal resold the property for $45,000, or more, Aitken would then have had some undefined interest in the proceeds. The appellants contend that this so-called uncontradicted evidence conclusively demonstrates that Mrs. Neal was a *bona fide* purchaser.

As already pointed out, the trial court found that Mrs. Neal had actual and constructive notice of the deed of trust. The court also found that Mrs. Neal and the Hanlons were mere nominal parties, acting for Aitken, and that the transfers to Neal and the Hanlons were in execution of a plan concocted by Aitken to prevent the loan company from realizing on its deed of trust. Appellants urge that these findings are unsupported.

The facts have already been set forth in this opinion. A reading of the record demonstrates that the above-mentioned findings are amply supported. It is true that there is no direct evidence contradicting Aitken and Mrs. Neal, and in the nature of things such evidence would be almost impossible to secure. But the surrounding circumstances demonstrate almost to a certainty that Mrs. Neal was a mere dummy for Aitken who had conceived the entire plan as a method of defeating the loan company's lien in retaliation for his real, or fancied, grievances against that company.

What does the record show to support this theory of the case? It shows that, although Mrs. Neal was seventy-three years of age and confined to her room with illness when this transaction was entered into, she was in full control of her faculties. At this time, and for some time prior thereto,

Aitken had been her close friend, confident, business adviser and attorney. By will, she left her entire estate (including this property, if she has any interest therein) to Aitken's son. Her testimony was taken by deposition. Although the record shows that she was an educated woman, having taught in the San Francisco public schools for many years, and later having acted as a supervisor over a portion of the public schools of Manila, her testimony is full of evasions and equivocations. She made many damaging admissions during the taking of her deposition, but such answers were all changed upon the signing of her deposition. Many of these changes caused the answer as corrected to be diametrically opposed to that given originally. Her counsel contends that these corrections were necessary because of the errors of the shorthand reporter. She admitted she knew practically nothing about this apartment house that she was purchasing for $15,000. She did not give Aitken any writing evidencing a release of the indebtedness. She did not know how many apartments, or, in fact, how many floors, were in the building. She did not know who the manager was or whether books of account were kept. She had no idea at all of the income of the property, whether she had any fire or other insurance on it. She did not know whether she had purchased the furniture along with the building, or whether she had sold such furniture to the Hanlons. No title search was secured, nor did she ever ask Aitken about the building or about the title. It is a clear inference from her testimony that she was not an innocent purchaser for value; that she never purchased the property at all; that she was a mere dummy for Aitken in the transaction; that she knew she had no interest in the property.

These inferences are confirmed by the testimony of Aitken. He testified, in effect, that he conceived the plan, by which he intended to defeat the note and deed of trust that he had executed, in order to ''get even'' with the loan company. To accomplish this purpose he ''sold'' the property to Mrs. Neal by ''canceling'' a debt owed by him to her. He admittedly secured no written evidence of the cancellation. He or his office prepared all of the deeds and documents in the Aitken-Neal-Hanlon transactions. In protecting his client and close friend he secured no title search, nor was a proration of rents computed. He testified he was to pay outstanding bills. Either Aitken or his wife continued to collect the

rents after the alleged transfers as they had done before. The manager of the apartment house was not told of any change in ownership, and she continued to look to Aitken for instructions. Aitken conceded that no notification to any of the fire insurance companies was given as to the alleged change in ownership although failure to notify them may have voided the policies. He knew the property was worth more than $15,000, and, in fact, fixed its value at about $45,000. He admittedly had a tentative and informal arrangement with Mrs. Neal whereby he was to receive some undefined portion of the profit if the property were resold.

No useful purpose would be served by extending this opinion for the purpose of further discussing this phase of this appeal. Suffice it to say, that it is a reasonable inference from the above testimony that Mrs. Neal was not only not a *bona fide* purchaser, but was not a purchaser at all. The inference is clear that she was a mere dummy for Aitken, and that both Neal and the Hanlons in fact held title for Aitken. It is true that Aitken and Neal denied this. But the trial court was not bound by their testimony. ▮ While it is true that a trial court may not arbitrarily disregard the uncontradicted and unimpeached testimony of a witness (*Hynes* v. *White,* 47 Cal. App. 549 [190 Pac. 836]), it is equally true that the trial court is the sole judge of the credibility of the witnesses, and that the testimony of a witness may be impeached other than by direct contradiction. (*Biurrun* v. *Elizalde,* 75 Cal. App. 44 [242 Pac. 109]; *Whitaker* v. *Whitaker,* 137 Cal. App. 396 [30 Pac. (2d) 538].) Under proper circumstances, the trial court may disregard uncontradicted testimony. (See annotation, 8 A. L. R. 796.) Moreover, the manner in which the witness testifies, the character of his testimony, his motives, and the inherent probabilities of the situation all may be sufficient to entitle the trial court to disregard so-called "uncontradicted" evidence. (*Bohn* v. *Gruver,* 111 Cal. App. 386 [295 Pac. 891].) Applying these rules to the present case, it seems quite clear that the trial court was justified in disregarding the testimony of Aitken and Mrs. Neal, and that its inference that Mrs. Neal was a mere dummy for Aitken is amply supported.

▮ Even if this inference was not a reasonable one, this would not assist appellants. If it be held that Mrs. Neal

was a purchaser of the property, she was not a *bona fide* purchaser. This is so because Aitken was clearly her agent and attorney in these transactions, and his knowledge must be imputed to her. While ordinarily, where the agent is dealing directly with the principal in a transaction, knowledge of the agent gained independently of his employment may not be chargeable to his principal, the present transaction is not an ordinary one. Aitken testified he had received from Manila about $17,000 for the account of Mrs. Neal. This money he deposited, with her consent, in his personal account. He received this money as agent. He used it for his personal purposes with her consent. Then he induced her to buy this property from him by canceling a portion of this indebtedness. She testified she entirely relied upon him in the transaction. In other words, she appointed him her agent to look out for her interests. He knew of the trust deed at all times. Can it be the law that a principal may thus place complete control of a transaction in the hands of her agent, a transaction suggested, induced and controlled by the agent, and that the agent may knowingly, intentionally and deliberately use the transaction to injure innocent third parties, without the principal being bound by the knowledge of her agent? I think not. ██ It seems to me that § 2332 of the Civil Code, which provides that, "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other" was enacted for the very purpose of taking care of situations like the instant one. This rule is based upon the principle that it is the agent's duty to communicate to his principal the knowledge that he has with respect to the subject matter of the negotiation, and the presumption is that he has performed that duty. Where this presumption arises, it is conclusive. The rule imputing notice is not affected by the agent's failure to communicate his information to his principal. (See cases collected and commented on in 1 Cal. Jur. 846, § 125; 1 Cal. Jur. 853, § 130.) ██ While it is generally stated that before knowledge will be imputed, the agent must gain the knowledge in a transaction within the scope of his authority, that is neither a complete nor a correct statement of the rule. It is well-settled that the rule that notice to the agent is notice to the principal, extends to cases where the notice was imparted to

the agent so near before the transaction in question that he must be presumed to recollect it. (*Wittenbrock* v. *Parker*, 102 Cal. 93 [36 Pac. 374, 24 L. R. A. 197]; *Bierce* v. *Red Bluff Hotel Co.*, 31 Cal. 160; *Cooke* v. *Mesmer*, 164 Cal. 332 [128 Pac. 917].) A good illustration of this extension of the rule is to be found in *Christie* v. *Sherwood*, 113 Cal. 526 [45 Pac. 820], where a bank cashier's knowledge of an encumbrance arising out of a previous transaction was imputed to the bank. It is true that before this extension of the rule will be applied it must be shown that the knowledge of the former transaction was present in the mind of the agent at the time of the second transaction. ▮ That was clearly shown in the instant case, in fact, it was admitted by Aitken. Under these circumstances, even if Mrs. Neal was a purchaser she was not a *bona fide* purchaser because the knowledge of Aitken must be imputed to her.

This disposition of this point makes it unnecessary to decide whether, as urged by respondent, the recordation of the deed of trust defectively describing the premises gave constructive notice of its contents—in other words, whether the defective recordation was sufficient notice to place a purchaser under a duty of inquiry. We do not pass upon that point.

### *Was the loan company entitled to a reformation of the Aitken deed of trust?*

▮ Appellants contend that the loan company was negligent in preparing and in not reading and discovering the mistake in the description; that in such circumstances there is no right of reformation; that the mistake must occur without fault or negligence of the party who complains of it. That is not a correct statement of the law. It is true that there are cases denying reformation where the person seeking that relief was negligent. (See cases collected and commented on in *California Trust Co.* v. *Cohn*, 214 Cal. 619 [7 Pac. (2d) 297].) But there are other cases holding that failure to read a contract does not necessarily prevent a reformation. (See *Los Angeles & R. R. Co.* v. *New Liverpool Salt Co.*, 150 Cal. 21 [87 Pac. 1029]; *Travelli* v. *Bowman*, 150 Cal. 587 [89 Pac. 347]; *Cantlay* v. *Olds & Stoller Inter-Exch.*, 119 Cal. App. 605 [7 Pac. (2d) 395].) Whether the failure to discover the defective description was the result of inexcusable negligence, so as to preclude relief by way of reformation, or, whether the failure to discover the error

was the result of excusable neglect, is a question of fact, the determination of which rests largely in the discretion of the trial court. In the instant case, Aitken admitted that it was the intention of all of the parties concerned that the trust deed should cover the premises at 1350 Turk Street, San Francisco. He testified that he did not observe or know about the mistake when the deed of trust was executed. The title company did not observe the mistake in description. As was said in *Los Angeles & R. R. Co.* v. *New Liverpool Salt Co., supra,* at p. 28: "There was, it is true, some negligence on the part of the plaintiff in the case at bar. But it was an inadvertence of a character which will sometimes occur in the conduct of men of prudence and caution. . . . The negligence [in failing to read the document and to observe the error] was not so gross as to constitute a neglect of legal duty, or forfeit the right of either party aggrieved to relief from the mistake." That language applies with particular force to the present case. That a mistake was made clearly appears, and the precise mistake is so plain that the true intent of the parties as to the property intended to be covered could not be, and is not, disputed.

 It is also contended that, because the proper description of the property rests on parol testimony, the statute of frauds prevents reformation. Appellants cite several cases for the point that the description of the property conveyed is an essential part of a deed and if insufficient or incomplete it cannot be made good by parol evidence. It is said in these cases that the deed, under such circumstances, is void. (See *Saterstrom* v. *Glick Bros. Sash etc. Co.,* 118 Cal. App. 379 [5 Pac. (2d) 21]; *Gordon* v. *Perkins,* 108 Cal. App. 336 [291 Pac. 644]; *Scott* v. *Woodworth,* 34 Cal. App. 400 [167 Pac. 543]; *Craig* v. *Zelian,* 137 Cal. 105 [69 Pac. 853].) None of these cases was an action for reformation. They were actions for breach of contract for the sale of real property or for specific performance. The rule therein announced has no application to actions for the reformation of a deed. The Saterstrom case, *supra,* expressly recognized this when it stated (p. 383): "There was no attempt to reform the deed of trust to set forth a correct and definite description of the property."

In other jurisdictions there is some conflict of authority upon the question as to whether a court of equity will reform a contract within the statute of frauds, and enforce it

as reformed. (See cases collected 53 Corpus Juris 911, § 11.) In an annotation on the subject appearing in 86 A. L. R. 448, it is stated (p. 450) to be "well-settled" by the "weight of authority" that the statute of frauds is no obstacle to reformation in this situation.

In *Travelli* v. *Bowman,* 150 Cal. 587 [89 Pac. 347], a deed which described land as being in the wrong county was reformed. In *Oatman* v. *Niemeyer,* 207 Cal. 424 [278 Pac. 1043], the property was described as being in the "city of Wheatland, County of Yuba, State of California, and bounded and particularly described as follows, to-wit: . . . " The particular description was entirely omitted, but, nevertheless, reformation was decreed. These cases, in addition to necessarily determining that the statute of frauds offers no insurmountable barrier to reformation, also furnish an answer to appellants' contention that reformation should be denied because a reading of the deed would have plainly disclosed the mistake. In neither of these cases was there any antecedent written contract which contained the correct description. It should be mentioned that in the present case the correct description does not entirely depend on the oral testimony of the parties. Not only did Aitken concede that the deed of trust was intended to describe the premises at 1350 Turk Street, but, prior to the execution of the deed of trust, he signed an application for a loan with the loan company in which the property was fully and correctly described. Other documents fully and correctly describe the property. Under these circumstances, we think that the trial court had the power to decree reformation of the deed—in fact, any other conclusion would have been an abuse of discretion.

### Did the trial court properly reform the notice of breach and election to sell?

Appellants next urge that the trial court had no power to reform the notice of breach and election to sell; that § 3399 of the Civil Code provides only for the reformation of contracts; that there is no statutory authority for the revision of a notice; that where a statute requires a particular notice to be given, that notice must be given; that a defective notice cannot be corrected *nunc pro tunc* to make it comply with a statutory requirement.

To these contentions there are two answers. In the first place, it is very doubtful whether the notice of breach and

election to sell had to be reformed. If the description in the notice was legally sufficient to describe the premises at 1350 Turk Street, San Francisco, the mere fact that it was "reformed" to describe those premises would not give appellants cause to complain. It will be remembered that the notice of breach and election to sell described the property as follows:

"THAT WESTERN STATES REALTY COMPANY, a corporation, is Trustee under that certain Deed of Trust, made by Thomas D. Aitken and Marian N. Aitken and recorded in Liber 2148 Page 73 of Official Records in the Recorder's Office of San Francisco County, California, and covering the following described property in San Francisco, Alameda County, California." Thereafter follows a legal description of the property wherein it appears that the property is located at Turk and Webster Streets in Western Addition Block No. 305. The section that requires the notice to be filed (§ 2924 of the Civil Code) expressly requires the trustee to file a notice either "identifying the . . . deed of trust by stating the name or names of the trustor or trustors and giving the book and page where the same is recorded," or to give "a description of the . . . trust property." Here the reference to the book and page where recorded was complete and exact in all details. The trustee then attempted also to do something he was not required to do—to describe the trust property. There he erroneously stated, "San Francisco, Alameda County." Could any reasonable person being reasonably familiar with this general area have read that description without knowing instantly that the words "Alameda County" were improperly inserted? Could any such reasonable man have come to any other conclusion but that the property was in San Francisco? I think not.

Section 2077 of the Code of Civil Procedure provides in part:

"The following are the rules for construing the descriptive part of a conveyance of real property, when the construction is doubtful and there are no other sufficient circumstances to determine it:

"1. Where there are certain definite and ascertained particulars in the description, the addition of others which are indefinite, unknown, or false, does not frustrate the convey-

ance, but it is to be construed by the first-mentioned particulars. . . . "

In applying the rule of construction above-stated, the courts of this and other states have established the rule that in interpreting a deed, and certainly the same rule should apply to a notice, that: "If from the description in the deed, taking into consideration all its calls, it is possible by rejecting calls which are apparently false to ascertain its application to a particular tract of land as embraced within the description, the false call will be rejected and the deed sustained." (*Hall* v. *Bartlett*, 158 Cal. 638, 642 [112 Pac. 176]; see, also, *People* v. *Ayer*, 18 Cal. App. (2d) 755 [64 Pac. (2d) 769]; cases collected in 9 Cal. Jur. 293, § 158; 26 C. J. S. 336, § 90 et seq.; and 16 Am. Jur. p. 586, § 263.) Under this rule of construction the superfluous words "Alameda County" could have been deleted from the notice, leaving the notice complete and correct.

If this construction of the notice is correct, and we believe that it is, then it offers another complete answer to appellants' contention that Mrs. Neal was a *bona fide* purchaser. This notice, which we hold to be a proper notice, was properly recorded in San Francisco on September 22, 1931. The Aitken-Neal deed was dated December 29, 1931, and was recorded January 6, 1932. Obviously, therefore, this notice gave constructive notice to Mrs. Neal of the Aitken deed of trust.

Even if the notice were imperfect, the trial court had power to reform it. The court clearly had authority to reform the deed of trust. Since this is so, the equity court had power to do full justice by reforming all subsequent documents which perpetuate the error. This rule was laid down in this state as early as 1869 in the case of *Quivey* v. *Baker*, 37 Cal. 465. In that case the mortgage and all proceedings down through the judgment of foreclosure and the sheriff's deed erroneously described the mortgaged premises. In holding that reformation could be granted as to all these documents the court stated (p. 472) : "But a Court of equity does not administer justice on these narrow principles. It will not only go back to the original error and reform it, but will administer complete justice, by correcting all subsequent mistakes which grew out of and were superinduced by the first. It would be a vain thing to reform the first

and perpetuate the last, by refusing to disturb it. The rule in equity is to do nothing by halves; but, in proper cases, to administer a full measure of relief, so as to avoid circuity of action and promote the ends of justice.'' (See, also *Busey* v. *Moraga,* 130 Cal. 586 [62 Pac. 1081]; *Dunning Brothers Co.* v. *Johnson,* 47 Cal. App. 397 [190 Pac. 829].)

*May the trial court reform a deed of trust so as to*
*. validate a sale had before the reformation?*

■ Appellants urge that a reformation of a deed of trust should not have the effect of validating a sale under the deed of trust which has taken place before reformation, even though there are no rights of purchasers without notice involved. It is contended that the effect of the defective description as unreformed, even though there may be no doubt as to the property intended to be covered, would be to discourage possible buyers at the trustee's sale. Such prospective buyers, seeing the defective description, it is urged, would know they were buying a lawsuit, and, therefore, would be discouraged from bidding.

On the question as to whether, after foreclosure of a mortgage or sale under a deed of trust, where there is a defective description and reformation is sought, the trial court should order a new sale of the property, there is a conflict of authority. The problem is discussed in annotations in 73 A. L. R. 612, and 89 A. L. R. 1444. There is some authority to the effect that in fairness to all concerned a new sale should be ordered. However, the weight of authority seems to be to the effect that the matter rests in the discretion of the trial court. If the trial court is of the opinion that, under all the circumstances, a new sale should be ordered, it may order such sale. But if the trial court, after considering all of the circumstances, is of the opinion that a new sale is not equitably necessary, it may reform the deed without ordering such new sale. California has definitely aligned itself with this school of thought. The first case where the matter was considered was *Quivey* v. *Baker, supra.* In that case the mortgage described the property as ''Lot Six, in Block Three, and Range Two North.'' The property intended to be covered was ''Lot Six, in Block Two, Range Three North.'' The erroneous description was carried into the decree of foreclosure, the order of sale and the sheriff's deed to the purchaser. The court decreed reformation of the judgment and sheriff's deed, as well as the

mortgage, and did not order a new sale. This case was cited with approval in *Busey* v. *Moraga, supra.* In that case the mortgage, foreclosure decree, notice of sale and certificate of sale erroneously described certain lots as in "block H" instead of "block K." The trial court denied reformation. In reversing the judgment the Supreme Court stated (p. 588) :

"It is also urged as an objection to the remedy by independent action that the mortgagor is deprived of his property by a sale without notice, the property having been described as certain lots in block H; but it is in the power of a court of equity, after having reformed the mortgage and proceedings down to the sale, to direct a new notice and sale if justice requires it." The court did not indicate whether a new sale was to be required. It left that problem up to the trial court to be determined on the facts of the particular case.

Appellants urge that the holding in *Quivey* v. *Baker, supra,* that, after foreclosure sale the court may reform the foreclosure decree and deed as well as the mortgage, and that a new sale is not necessary, has been overruled by the case of *Hull* v. *Calkins,* 137 Cal. 84 [69 Pac. 838]. It is true that the court in that case did state (p. 88), in referring to the Baker and other cases, that: "In these cases, as in the case of *Waldron* v. *Letson* [15 N. J. Eq. 126] the equities of the case were very strongly in favor of the purchaser or his successors in interest, and, as in that case, may have justified the actual decision; but it is difficult to perceive on what recognized principle of equity the court was justified in amending the sheriff's deed. But whatever may be the merits of those decisions, they differ from the case at bar . . . ." In the Hull case the foreclosure proceedings did not contain a misdescription as such, but omitted to provide for a sale of a material part of the property. Obviously, in such a case, the equities might well require a new sale. The court did not refer to the case of *Busey* v. *Moraga, supra.*

It seems quite clear to us that the court, in the Hull case, *supra,* did not intend to overrule the Baker case, *supra.* The most that can be said is that under the facts of the Hull case, a new sale was required. But, under the facts of this case, there are no compelling reasons why a new sale should be required. The error in the description in the trust deed

604

was obvious and would mislead no one. The notice of breach and election to sell, as already pointed out, contained a proper description. The trustee's deed contained a proper description. No prospective purchaser at the trustee's sale was, or could have been, misled or discouraged from bidding. Moreover, the loan company did not seek or secure a deficiency judgment against the Aitkens. These were all matters before the trial court, and were undoubtedly some of the reasons why a new sale was not ordered. It is our view that, under the circumstances of this case, the trial court acted well within its equitable powers in reforming the trust deed and other documents without requiring a new sale.

### Other Contentions of Appellant.

As already pointed out, appellants make numerous other technical contentions. The pleading of respondent is attacked on many technical and minor grounds. The findings are attacked with a fine tooth comb as being inconsistent, and, in many respects, unsupported by the evidence. It is urged, among many other things, that it was error to permit respondents to seek to quiet title to the parcel at 1340 Turk Street, San Francisco, by means of a cross-complaint. By the cross-complaint respondent also sought reformation. The filing of the cross-complaint was clearly proper. The record shows that both parcels of land were involved in one transaction, and both deeds of trust were executed at the same time as part and performance of an agreement between Aitken and the loan company for a settlement of their difference.

For a time, the cases seem to overlook the right to bring in, by cross-complaint, a cause of action arising out of the same transaction as that set forth in the complaint, but which would not otherwise be a proper subject of cross-complaint. More recent cases have clearly established the right. (*California Trust Co.* v. *Cohn*, 214 Cal. 619 [7 Pac. (2d) 297]; *H. & J. Mabury Co.* v. *Bryant*, 9 Cal. (2d) 586 [71 Pac. (2d) 1111].)

It is also well-settled that when the circumstances warrant reformation, it may be had by means of a cross-complaint in an action brought to quiet title. (*California Trust Co.* v. *Cohn, supra; Murphy* v. *Lacey*, 204 Cal. 94 [266 Pac. 535].)

The record shows that after the commencement of this action the trial court appointed a receiver. Appellants ap-

pealed from that order, and also applied for a writ of prohibition, attacking the validity of that order. The appeal was dismissed and the writ denied. They now appeal from an order settling the receiver's accounts, and make the sole contention that the order appointing the receiver was void. The order appointing the receiver was an appealable order (§ 963 of Code of Civil Procedure). An appeal was taken and that appeal has been determined adversely to appellants.

On the appeal from the order settling the accounts the appellants cannot be permitted to review the validity of the order appointing the receiver. Otherwise, appellants would have two appeals from the same order. Moreover, even if the appointment of the receiver could now be questioned, the alleged want of jurisdiction would have to appear on the face of the order. Such is not this case.

The other contentions of appellants have been considered by the court. They are too insubstantial to require specific discussion. They are all without merit.

The judgment and order appealed from are affirmed.

Knight, J., and Ward, J., concurred.