[Civ. No. 20561. First Dist., Div. Two. Oct. 28, 1963.]

DELPHINE KELLEY, Plaintiff and Respondent, v. BRI-
TISH COMMERCIAL INSURANCE COMPANY, LTD.,
Defendant and Appellant.

David Livingston for Defendant and Appellant.

Boccardo, Blum, Lull, Niland & Teerlink and Edward J. Niland for Plaintiff and Respondent.

SHOEMAKER, P. J.—Defendant British Commercial Insurance Company, Ltd., appeals from a money judgment in favor of plaintiff Delphine Kelley.

The relevant facts may be summarized as follows: In 1955, the defendant British Commercial Insurance Company, Ltd., an English liability insurer, issued a policy of excess liability insurance in the amount of $20,000 in favor of Olson and Thacker, doing business as the Yellow Cab Company. Olson and Thacker had already obtained primary liability insurance coverage in the amount of $5,000 from the Industrial Indemnity Company.

On December 28, 1955, plaintiff was injured in a collision with a Yellow cab. On June 30, 1956, she commenced an action to recover damages for her personal injuries. Industrial, obligated under its policy to defend the action, accordingly employed the law firm of Mento, Buchler & Littlefield to handle the case. The defendant, an English firm having no regular agent within the United States, employed Cravens, Dargan & Company, general insurance agents in San Francisco, to look after its interest in the litigation. Cravens was given no authority to settle the claim on behalf of the defendant. Its function was to observe the progress of the case and to communicate any developments to the Stewart Smith Company, Ltd., a London insurance syndicate, which in turn would relay the communications to defendant.

Mr. Prendergast, the claims manager for Cravens, testified that his firm left the investigation and defense of the Kelley claim to the primary insurer; that he did employ an investigator, however, to peruse the information which had been gathered by Industrial and to apprise him of its contents, among which were two medical examination reports by Dr. Hathaway made for the company. On the basis of the information available to him, he concluded that the amount of plaintiff's damages was the sole issue in the case.

On March 1, 1957, three days before the trial was scheduled to commence, Prendergast employed the law firm of Rich, Fuidge & Dawson to sit in on the proceedings and

inform Cravens of all developments. Dawson reviewed the case and formed the opinion that it was worth no more than $7,500 or $10,000. Although the Kelley complaint had originally prayed for $50,000 and had been amended in November 1956 to ask for $75,000, the complaint made no mention of brain damage. Neither was there any reference to brain damage in the Hathaway medical reports, or in plaintiff's deposition, which had been taken by Industrial nearly a year after the accident.

On March 1, 1957, Dawson was informed by plaintiff's attorneys that the case could be settled for $17,500. When Dawson indicated that this figure was too high, he was asked what he thought of $12,500. He replied that it was still too much money. Dawson informed Prendergast of the offer on the same day, and he immediately dispatched the following cable to the defendant by way of its intermediary, Stewart Smith: ''Trial start [sic] next week demand still $17,500 this excessive but should make offer request you cable authority to offer $5,000 primary limits available.'' This cable arrived in London on Saturday, March 2, 1957, a day when the Stewart Smith offices were not open for business. It was not relayed to the defendant until the morning of March 4, 1957, the day upon which the trial commenced. The defendant immediately dispatched a return cable authorizing an offer of $5,000 over and above the coverage provided by Industrial.

Meanwhile, on March 2, 1957, plaintiff's attorneys informed Dawson that she had been examined by a neuropsychiatrist, Dr. Bromberg, and that it was the doctor's opinion that her injuries were very serious and that the case should not be settled for less than $17,500.

On March 4, 1957, Marsh, of Dawson's firm, attended the trial. Prior to the commencement of the trial, Marsh was called into the judge's chambers, where Littlefield informed Marsh that the primary insurer was willing to tender the full amount of its $5,000 coverage and to allow the defendant, as excess carrier, to assume the defense, which offer Marsh declined. Whereupon, plaintiff's attorneys then made a formal offer to settle the case for $25,000, the total amount of the insurance coverage.

The trial proceeded and Mrs. Kelley was called as a witness on her own behalf. She had great difficulty in responding to questions and appeared unable to get her words out. After attempting to answer the first few questions directed to her, she began to cry, and the trial judge thereupon recom-

mended that she be withdrawn from the stand. She then walked to the back of the courtroom with her head down and with a vacant stare on her face.

After court had adjourned for the day, Marsh communicated with both Dawson and Prendergast and informed them that Mrs. Kelley's appearance on the witness stand could have had a bad effect on the defense.

On March 5, 1957, Dawson attended the trial. During the afternoon session, Dr. Bromberg testified that plaintiff had sustained severe and permanent brain damage as a result of the accident. Littlefield then obtained a court order authorizing the defense to have her examined by a brain specialist, and she was examined by Dr. Petzold on the evening of March 5, 1957. Dawson communicated with Prendergast and informed him that the case was not going well for the defense.

On March 6, 1957, the third day of the trial, plaintiff's attorneys again offered to settle the case for $25,000. This offer was to remain open until the jury was instructed. Dr. Petzold then testified on behalf of the defense that plaintiff was suffering from an emotional disturbance unrelated to the accident. He also testified however, that she was clearly incompetent and ought to be institutionalized. At this point, plaintiff's attorney moved for the appointment of a guardian. On cross-examination, Dr. Petzold evinced some uncertainty as to whether Mrs. Kelley's mental condition might not have been triggered by the accident. On the same day, Olson gave Dawson a written demand that the defendant settle the case for $25,000.

At this stage in the proceedings, Littlefield and Dawson both concluded that the case was going extremely poorly for the defense and that prompt settlement was imperative in order to avoid a verdict well in excess of the policy limits. Sometime after 11 a.m. on the morning of March 6, Dawson telephoned Prendergast and asked him to obtain authorization from the defendant to settle the case for $25,000, informing him that settlement would have to be made on the following morning because in all probability the case would go to the jury on that day.

At 11:58 a.m. on the morning of March 6, Prendergast dispatched the following cable to London: "Trial in progress demand made upon policy LO14016 for limits by insured primary carriers defense extremely poor our councils [sic]

say verdict over limits likely and recommend surrender our limits to avoid excess judgment settlement demand $25,000 must have cable authority Thursday a.m. cable Prendergast. . . .'' Due to the eight-hour time differential, this cable did not arrive in London until 8:40 p.m., well after the Stewart Smith offices had closed for the day. The cable was received by Stewart Smith on the morning of March 7, and was immediately relayed to the defendant. The defendant then dispatched the following cable to Prendergast: ''Underwriters unable understand increased demand $25,000 why not settle 17,500 full explanation required.'' This cable was received on the morning of March 7, and immediately passed on to Dawson. Although the case had not yet gone to the jury, Mrs. Kelley's attorneys refused to settle for $17,500. The case was then submitted to the jury, which returned a $40,000 verdict for plaintiff.

Following the entry of judgment, Olson assigned his policy with the defendant to plaintiff, who then commenced the present action against the defendant to recover $15,000, the amount by which the judgment had exceeded the total insurance coverage.[1] Defendant's liability was predicated upon the theory that it had been guilty of bad faith toward its insured in refusing to settle the Kelley claim within the limits of its policy. After a trial by jury, verdict and judgment were for the plaintiff.

Appellant first contends that the court's instructions on imputation of knowledge were fatally defective because they merely set forth the rule that knowledge acquired by an agent is conclusively deemed to be the knowledge of the principal, and did not state that the imputation of such knowledge occurs only after the lapse of such time as is reasonable for its communication by the agent to the principal. Appellant asserts that the unqualified instructions given by the court implied that the communication of the agent's knowledge was instantaneous. Appellant contends that the correct rule is otherwise, and that the failure to so apprise the jury constituted prejudicial error because the eight-hour time differential between California and London was a crucial factor in the present case.

█ Civil Code, section 2332, provides that ''As against a

[1]It may be noted that the complaint was filed by T. J. Hetland, as guardian of the estate of Delphine Kelley, who had been declared incompetent on June 7, 1957. This guardianship was terminated on April 2, 1959, prior to entry of judgment.

principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other.'' The decisions construing this section have held that the rule of imputed knowledge is based upon the presumption that the agent will perform his duty to his principal and will communicate all knowledge which he has gained relative to the subject matter of his agency. (*Hanlon* v. *Western Loan & Bldg. Co.* (1941) 46 Cal.App.2d 580, 596 [116 P.2d 465]; *Maron* v. *Swig* (1952) 115 Cal.App.2d 87, 91 [251 P.2d 770].) ▉ Section 278 of the Restatement Second of the Law of Agency provides that when it is an agent's duty to communicate information and not otherwise to act, the knowledge acquired by him will be imputed to his principal only after the lapse of such time as is reasonable for its communication. ▉ ''Hence, a principal is not affected by the knowledge of an agent until it is communicated to him or until the one having the knowledge has committed a fault either in transacting something for the principal or in failing to communicate it to others who are to act upon it.'' (P. 606.)

▉ In the light of these authorities, the knowledge acquired by Dawson and Prendergast could not be imputed to appellant until the lapse of a reasonable time for its communication. However, we do not feel that an instruction to that effect could have been of any benefit to appellant. The record shows that the evidence before the trial court conclusively established that Prendergast had in fact communicated to appellant, in ample time to effect a settlement, all of the information which he considered necessary. On March 4, Dawson and Prendergast knew plaintiff's attorneys were demanding $25,000 in settlement, that the proof of damages was going badly against the defense, and by the close of the court session of March 5, Dawson was in possession of overwhelming information which made prompt settlement of the case imperative. As we know, Prendergast had communicated information concerning the status of the case to appellant. In the face of an accomplished communication between agent and principal, appellant is clearly in no position to contend that a reasonable time for communication had not yet elapsed and that there could accordingly be no imputation of the agent's knowledge to the principal. ▉ Once communication is presumed to have occurred (or, as in the present case, *shown* to have occurred), the principal is charged with know-

ledge of all the information acquired by the agent relative to the scope of his agency. ■ This rule of law may not be defeated by proof that the agent failed in his duty and that the knowledge acquired by him was not in fact communicated to his principal. (*Columbia Pictures Corp.* v. *DeToth* (1948) 87 Cal.App.2d 620, 630 [197 P.2d 580]; *Granberg* v. *Turnham* (1958) 166 Cal.App.2d 390, 395 [333 P.2d 423].) ■ Where the agent is at fault in failing to communicate certain information to his principal, the latter is nevertheless affected by the knowledge of the agent. (Rest. 2d Agency, § 278, p. 606.)

■ The trial court's instructions on imputation of knowledge were accordingly correct and any reference therein to the lapse of a reasonable time for communication would have been misleading as well as unnecessary.

■ Appellant next contends that respondent failed to sustain the burden of proving that appellant was guilty of bad faith in failing to settle the case within the limits of its insurance coverage. We do not agree. ■ It is now settled in California that a policy of public liability insurance pursuant to which the insurer reserves the right to defend an action on a claim arising under the policy, and is authorized to settle the same within the policy limits, imposes upon the insurer the obligation to exercise good faith in considering an offer of compromise within those limits. (*Davy* v. *Public National Ins. Co.* (1960) 181 Cal.App.2d 387, 394 [5 Cal.Rptr. 488]; *Hodges* v. *Standard Accident Ins. Co.* (1961) 198 Cal. App.2d 564, 571 [18 Cal.Rptr. 17]; *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 659-661 [328 P.2d 198]; *Ivy* v. *Pacific Automobile Ins. Co.* (1958) 156 Cal.App. 2d 652, 659 [320 P.2d 140]; *Brown* v. *Guarantee Ins. Co.* (1957) 155 Cal.App.2d 679, 682 [319 P.2d 69].) ■ In determining whether an offer of settlement is reasonable, the insurer, although entitled to protect its own interests, does not have the right to sacrifice the interests of the insured. (*Ivy* v. *Pacific Automobile Ins. Co., supra,* at p. 659.) ■ Where there is a great risk of recovery beyond the policy limits and the most reasonable manner of disposing of the claim is a settlement within those limits, a good faith consideration of the insured's interests requires the insurer to settle the claim. (*Comunale* v. *Traders & General Ins. Co., supra,* at p. 659.)

■ In the instant case, appellant was well aware, long before the Kelley claim went to trial, that there was no de-

fense to the claim on the issue of liability and that the amount of damages was the sole issue in contention. Appellant nevertheless undertook no active investigation of the claimant's injuries but chose to rely on the primary carrier, Industrial, to investigate and defend the claim. At the time that appellant refused to settle the claim for $25,000, it had either actual or imputed knowledge of the fact that the trial was going badly from a defense standpoint and that a verdict well in excess of the insured's total coverage was likely. The attorney employed to sit in on the trial had advised it that immediate settlement was imperative. Appellant nevertheless authorized a settlement offer of only $17,500, thereby attempting to save $7,500 of its own funds at a risk of much greater loss to its insured. This evidence was clearly sufficient to support the jury's implied finding that appellant was guilty of bad faith toward its insured.

 Appellant urges, however, that it owed no duty of good faith toward its insured because it occupied the position of a secondary or excess carrier and took no active part in the defense of the Kelley action. This argument is untenable. First of all, appellant's control over the settlement negotiations was clearly separate and distinct from its right to take over the defense of the action. The public liability policy issued to Olson and Thacker specifically prohibited the insured from entering into any settlement in excess of Industrial's $5,000 coverage without first obtaining appellant's written consent. Since appellant alone had the authority to agree to a settlement in excess of $5,000, it was obviously under a duty to exercise good faith toward its insured in considering any offer of compromise within the limits of its policy. Furthermore, the fact that appellant took no active part in the defense of the Kelley action was entirely of its own choosing. Industrial tendered the full amount of its coverage prior to the commencement of the trial and offered to allow appellant to take over the defense. Appellant elected to reject this offer.

 Appellant's final contention is that the court erred in instructing the jury that Olson had assigned his claim against appellant to respondent. Appellant asserts, more specifically, that the record contains no evidence whatever that any such assignment ever took place.

In order to properly evaluate this contention, it must be noted that on May 2, 1955, appellant issued two separate policies of liability insurance to Olson and Thacker. The

policy that insured against liability for personal injuries, in its upper righthand corner, one below the other, bore this numerical designation: No. LO 14016, renewing No. New LO 14017; while the other policy, which protected the insured against liability for property damage, in the same corner and same fashion bore the number LO 14017, renewing No. New LO 14016. Due to this ambiguity and the great physical similarity between the two policies, the written assignment which respondent introduced into evidence referred to policy No. LO 14017 as the subject of assignment, rather than No. LO 14016.

This contention is not meritorious, for it is apparent from the face of the assignment that it was Olson's intent to transfer to respondent his cause of action against appellant for breach of contract. The assignment makes specific reference to the $40,000 judgment obtained by Delphine Kelley, to the $15,000 by which this judgment exceeded Olson's insurance coverage, and to the existence of "a cause of action for breach of contract" against appellant. Since the Kelley action was for personal injuries and not for property damage, it is apparent that it was Olson's intent to assign the policy insuring him against liability for personal injuries. It is the rule that the substance rather than the form of a transaction determines whether an assignment was intended. (*Bergin* v. *van der Steen* (1951) 107 Cal.App.2d 8, 16 [236 P.2d 613].) It is also settled that an effective assignment may be the product of inference, and where the parties to a transaction indicate an intent to transfer a specific claim, the courts will imply an assignment thereof. (*Greco* v. *Oregon Mut. Fire Ins. Co.* (1961) 191 Cal.App.2d 674, 683 [12 Cal.Rptr. 802].) In the present case, a reading of the written assignment leaves no doubt that it was intended to transfer Olson's rights under the policy covering liability for personal injuries rather than property damage. Under such circumstances, to hold that the parties are bound by an inadvertent use of one of two policy numbers held by the assigning party would be an injustice and be a surrender to form rather than substance.

Judgment affirmed.

Agee, J., and Taylor, J., concurred.

A petition for a rehearing was denied November 15, 1963, and appellant's petition for a hearing by the Supreme Court was denied December 18, 1963.