[Civ. No. 8004. Fourth Dist., Div. Two. Dec. 14, 1966.]

GEORGE H. CAPRON et al., Plaintiffs and Respondents, v. STATE OF CALIFORNIA et al., Defendants and Appellants.

Thomas C. Lynch, Attorney General, Marvin Goldsmith and Irwin M. Friedman, Deputy Attorneys General, for Defendants and Appellants.

Jacobs, Jacobs, Nelson & Witmer and Otto A. Jacobs for Plaintiffs and Respondents.

McCABE, P. J.—In June 1944, the Legislature enacted the Property Acquisition Act (Stats. 1945, Fourth Ex. Sess. 1944, ch. 18, pp. 149-153). As a portion of this enactment, the Property Acquisition Board was created and directed to acquire, on behalf of the state, real property sites in furtherance of the postwar proposed construction program as expressed in subsequent legislative appropriations for that purpose. Thereafter the Legislature appropriated the sum of $400,000 "to be expended under the provisions of the Property Acquisition Act for the acquisition of real property in furtherance of the postwar building program for use as a site for a state mental hospital under control of the Department of Institutions." (Stats. 1945, Fourth Ex. Sess. 1944, ch. 26, p. 157).

In 1946, by chapter 145, Statutes 1946 (Stats. 1947, First Ex. Sess. 1946, ch. 145), there was created the State Public Works Board. The members of this board were to be the Director of Finance, the Director of Public Works, and the Real Estate Commissioner. This act authorized two members of the state senate and two members of the assembly to meet with and participate in the work of the Public Works Board (hereinafter referred to as "Board"). By this

legislation: "The board shall determine when and if any construction, improvements, and equipment provided for by this act shall be undertaken and shall give due consideration to: (1) The immediate needs of State agencies for construction and improvements; (2) obtaining construction, improvements, and equipment at the most reasonable price consistent with such needs; (3) the needs of construction, improvements, and equipment at State agencies in relation to the needs for private construction, improvements, and equipment; (4) providing of public works to relieve unemployment." Also, there was an appropriation of money including an allocation of money to the Department of Mental Health. The Director of Finance was designated as administrator of the Act.

By the terms of item 214 of chapter 486, Statutes 1947 (Budget Act of 1947), the sum of $394,799 was approved, "For acquisition of real property for use as a site for a state mental hospital, Department of Mental Hygiene, to be expended under the provisions of the Property Acquisition Act. . . ."

By item 358, chapter 23, Statutes 1948, headnoted under the title "Postwar Construction Program," the Legislature appropriated $400,000 for acquisition of real property "as a site for a new institution for mental defectives, to be expended under the provisions of the Property Acquisition Act, Department of Mental Hygiene . . . which . . . shall be available to June 30, 1951, for the purpose and subject to the conditions set forth in this item."

On March 21, 1949, the board adopted a resolution which reads in relevant part as follows: "Resolution of State Public Works Board selecting site and authorizing acquisition of real property under the Property Acquisition Act (Chapter 18), Statutes of 1944, Fourth Extraordinary Session, as amended, in the County of Orange, State of California, for the Department of Mental Hygiene.

"WHEREAS, the Property Acquisition Act (Chapter 18), Statutes of 1944, Fourth Extraordinary Session, as amended, empowers the State Public Works Board to select and acquire in the name of the State of California suitable and adequate real property for use in furtherance of the post-war construction program provided for in Chapter 572, Statutes of 1943, as sites for the construction of buildings or for such other purposes as may be specified in legislation making funds available for such acquisition; and

"WHEREAS, Chapter 26, Statutes of 1944, (4th Extraordinary

Session) and Item 214 of the Budget Act of 1947 make appropriations for expenditure under the provisions of the Property Acquisition Act for the acquisition of real property in the County of Orange, State of California, for use as a site for a State mental hospital under control of the Department of Hygiene, in furtherance of the postwar building program;

"Now, THEREFORE, BE IT RESOLVED, that the hereinafter described real property be, and the same is hereby selected for acquisition under said Property Acquisition Act for the Department of Mental Hygiene, as specified in Chapter 26, Statutes of 1944 (4th Extraordinary Session), and Item 214 of the Budget Act of 1947.

"BE IT FURTHER RESOLVED by the State Public Works Board that it finds and determines and hereby declares: That public interest and necessity require the acquisition, construction or completion by the State of the improvement for which the real property herein is required, and that said real property is necessary for such improvement; that the real property herein described is necessary for such public improvement; that it is necessary that all of said real property be taken therefor, and that it is necessary that all of said real property be taken in fee simple therefor; that said proposed improvement is planned and located in a manner which will be most compatible with the greatest public good and the least private injury; that the use of all of the said real property herein described for such improvement is a public use authorized by law; and

"BE IT FURTHER RESOLVED by the State Public Works Board that this Board acquire pursuant to authority contained in the Property Acquisition Act, Chapter 26, Statutes of 1944 (4th Extraordinary Session), and Item 214 of the Budget Act of 1947, in fee simple in the name of the People of the State of California the said hereinafter described real property by proceeding or proceedings in Eminent Domain in accordance with the provisions of the Code of Civil Procedure relating to Eminent Domain; . . ."

Various sites were inspected, and on July 28, 1948, a member of the Public Works and Acquisition Division inspected the site ultimately selected which is also the subject of the present controversy (hereinafter the Capron tract). He recommended further investigation of the desirability of this parcel.

On September 29, 1948, the then Director of the Department of Mental Hygiene advised the Director of Finance that the Capron tract of 750 acres in Orange County was satisfactory

for the establishment of the proposed new mental hospital as provided in chapter 26, Statutes of 1944 (Stats. 1945, Fourth Ex. Sess. 1944, ch. 26), requested appointment of appraisers and institution of eminent domain proceedings. On the same day, the deputy director of mental hygiene informed Assemblyman Stanley (an assemblyman of the State Legislature from Orange County) the tract was satisfactory to the Director of Mental Hygiene and the entire 750 acres would be purchased. The deputy director expressed his appreciation to Assemblyman Stanley for his efforts in convincing the people of Orange County that such an institution would be an asset to the community. Appraisers were appointed to appraise the Capron property. The departmental policy of the Department of Mental Hygiene at that time provided that mental institutions which housed and cared for mentally defective patients did not have agricultural acreage but those which housed and cared for mentally ill patients had such acreage. This differentiation in policy was the result of the philosophy then prevalent that providing agricultural work for the mentally ill patients had therapeutic value thus aiding in their rehabilitation.

In August or September 1949, a new Director of Mental Hygiene was appointed. The new director made an inspection tour of existing facilities and sites which had been selected. The new director decided in late October or early November 1949 that the Capron land could not be used for rehabilitation and that such institutions should be closer to urban development. He desired and suggested to the finance department that the acquisition of the Capron tract, and a tract not here involved, be terminated. The new director was informed the arrangements for purchasing had gone too far. Later, in conference with the then Governor, the director was informed the arrangements to purchase had gone too far to abort them.

On January 20, 1949, Mr. Vincent, an employee of the State of California, acting on behalf of the State Public Works Board, had a conference with Assemblyman Stanley regarding the Capron tract. Mr. Vincent testified at the trial at the times here in question (1949-1952) a function of the Board was to purchase real estate whenever an appropriation was to be expended subject to the Property Acquisition Law. At the January 1949 conference, the status of the proposed mental hospital site was reviewed. Assemblyman Stanley was advised that as soon as the appraisal reports were received the matter would be ready for presentation to the Board, possibly in February

1949. After the Board met on March 21 and on March 24, 1949, Mr. Applegate, deputy director, Department of Mental Hygiene, informed Assemblyman Stanley the Board had authorized the condemnation of the Capron tract and that at a later date a bill would be introduced in the Legislature to name the institution "Fairview." Five days later and on March 29, Mr. Applegate again reviewed the situation with Assemblyman Stanley but more in detail. Among other items encompassed within the review were: (1) the number of mental cases; (2) mental defectives; (3) the number of patients transferred to the northern part of the state because of lack of space in Southern California; (4) the Capron tract was suitable and the investigation had established the land was sufficiently level, had agricultural value, water was available, climate favorable, and was situated between Los Angeles and San Diego in a community where employees might live; (5) mental defectives, sexual psychopaths, criminal insane, narcotic addicts, or any dangerous types would not be placed at "Fairview."

Two days later and on March 31, Mr. Vincent (Board representative) sent to the chief right-of-way agent and Mr. Johnson, deputy attorney general, certified copies of the Board's resolution of March 21, (*supra*). Mr. Vincent requested the right-of-way agent to accept responsibility of handling acquisition negotiations. He also requested the Attorney General's office to commence the necessary legal proceedings to acquire the Capron tract.

In April 1949, the Division of Architecture prepared and circulated a map showing existing easements and rights-of-way on the Capron tract. In its letter of transmittal, it was noted that a portion of the site would be used for farm land, the drainage ditches should be retained as beneficial and would not interfere with the building area.

On July 13, 1949, the State of California, acting by and through the Board, filed a complaint in eminent domain thereby seeking to condemn a fee simple interest in the Capron tract, naming both Mr. and Mrs. Capron as parties defendant. The Caprons were served with legal process in the fall of 1949 and filed their answer to the complaint in January 1950. This answer put in issue only the value of the tract.

Before the filing of the complaint in eminent domain and in February or March 1949, Mr. and Mrs. Capron learned the state intended to take the property for a mental hospital. Mr. Capron consulted Assemblyman Stanley. Mr. Capron had sev-

eral meetings in Sacramento with Mr. Vincent and Mr. Dean in which there were conversations concerning the taking of the Capron tract. Mr. Capron's protest against the taking was based upon the price which the Caprons were to receive for the property.

In keeping Assemblyman Stanley advised of progress, Mr. Vincent advised him in September 1949 that negotiations for the acquisition had been suspended until the arrival of Mr. Capron's brother-in-law and that Mr. Page (the negotiating agent) was optimistic. Mr. Vincent inquired of Assemblyman Stanley as to whether he believed Mr. Page was overly optimistic.

In October 1949 Mr. Applegate (deputy director, mental hygiene) wrote a letter to Mr. Vincent advising the acquisition would be deferred until the Director of Mental Hygiene had talked to the Director of Finance. In early November 1949, Mr. Applegate wrote to Mr. Vincent confirming that such discussions had taken place and stated the Department of Mental Hygiene desired to proceed with the acquisition but that possibly the department planned to use the land as an institution for mentally defectives rather than mentally ill and negotiations should continue on that basis. On this letter Mr. Vincent made a notation: "Discussed this on phone with C.E.A. later and he agreed we proceed on Costa Mesa as presently approved. Any change in program which would result in making Costa Mesa the mental defective hospital will be a responsibility of the Department of M. Hygiene after the land is acquired. V." (C.E.A. refers to Carl E. Applegate).

In December 1949, the Division of Architecture advised the state-employed engineering company if the institution were constructed it would house 2500 mental defective patients and there would be a water requirement of 150 gallons per day per patient with additional water for lawn and farm irrigation; also, though some water would be developed by wells, the majority would be from the metropolitan water district.

During the years mentioned above, news articles had appeared in various publications about the proposed institution being located in Orange County and the type of institution contemplated.

Although Mr. Capron had consulted with Assemblyman Stanley on many occasions prior to and after the filing of the condemnation action, he, in March 1950, had a conversation with Assemblyman Stanley advising him the price proposed was too low in view of the taking not only of the land but the

mineral rights, and authorized Assemblyman Stanley to nego-tiate and arbitrate with the State of California. A counter-offer by the state to the Caprons was made of $600 per acre, reserving the mineral rights and drilling easements, which counteroffer had to be accepted by March 15. Apparently this deadline was not met, but later an agreement was reached to acquire the tract for a total price of $410,000, reserving certain mineral and access rights to the Caprons. A stipulation was prepared and signed. The judgment was prepared, signed and entered on August 29, 1950.

Crucial to any rational delineation of the rights of the parties is a determination of the intent of the state in the acquisition of this site. By a letter, dated October 18, 1949, from the deputy director of the Department of Mental Hygiene, one Applegate, to the Director of Finance of that department indicated its director desired to delay the acquisi-tion of this site "until the Director of Mental Hygiene [Dr. Tallman] can talk with Mr. Dean [Director of Finance] thereon."

During the course of the trial, after he had been called by plaintiffs' counsel, Dr. Tallman (formerly Director of Mental Hygiene) when cross-examined by a deputy attorney general, testified as to the outcome of the meeting which occurred during the latter part of October 1949: "DR. TALLMAN: Well, on my return from this trip I told Carl Applegate, 'You had better get in touch with Finance and slow up this deal. Maybe we can take the money and buy something closer;' . . . Well, then I talked to Mr. Dean and raised the objections in effect that I have just given you, and Mr. Dean told me that the arrangements for purchasing had gone so far and that it would take legislative action and so on, that he felt that we had better go ahead and do what we were going to do, what they were going to do; and then in subsequent institutions we could move them—buy land closer to the cities. . . .

"THE COURT: And did you have an understanding with him [the Governor] as to what type of—did you talk to him about the Fairview Hospital at any time?

"DR. TALLMAN: Oh yes, I talked to him. We had a confer-ence, the Governor and Mr. Dean and myself. And this was when the decision was reached to go ahead with what had begun, because it had gone too far in their judgment to back out of.

"THE COURT: Now, what was the date of that conversa-tion?

"Dr. Tallman: Well, I can't remember the date of that conversation, but it would be between those two letters probably, . . . [dated October 18 and November 4, 1949].

"The Court: And the purpose for your calling the meeting?

"Dr. Tallman: Was to see whether or not we could avoid the purchase of these two lands until one, we had an opportunity to look over alternative pieces; and two, until it became clear exactly what we might use them for. . . .

"The Court: The result of the meeting was that the Fairview property would be acquired for the reason that it was too difficult to stop the wheels of government?

"Dr. Tallman: Yes. In fact—

"The Court: Was this the only reason given by the Governor or by Mr. Dean?

"Dr. Tallman: It was the only reason given to me. You see, I think it's fair to say in justice to the judgment of the people that we are talking about, that I had just recently arrived in the State. I had had relatively little opportunity to make my program clear, . . . Because after a while, as I just said, when property was to be acquired, then I had an opportunity fully to participate in it."

It seems reasonable to draw the conclusion from the foregoing and other evidence adduced during the trial that the purpose of the state in acquiring this property was for mental rehabilitation purposes but the new director, Tallman, desired a location more urban in nature. Prior to the condemnation of the Capron site the Director of the Department of Mental Hygiene desired to effect a change of site and there had been discussions to change the use from a hospital for mentally ill to mentally defectives. Such a change would concurrently preclude the implementation of the agricultural therapy programs carried on for the mentally ill at other state hospitals throughout the state at that time.

Throughout the record there is admitted evidence in the form of interdepartmental correspondence between varying state agencies which indicated that the Department of Mental Hygiene did not intend to utilize the Capron tract as a site for a state mental hospital for mentally ill but instead as a hospital for mental defectives. This latter use, because of the nature of the affliction of its inmates, would preclude by departmental policy the utilization of that site agriculturally.

The evidence reflects and it obviously was in the minds of many state officials, that the original appropriation in 1944

provided for acquisition of this tract "for use as a site for a State Mental Hospital. . . ." Also, the 1948 enactment, *supra*, appropriated $400,000 for use in acquiring real property for a new institution for mental defectives. Yet the Department of Mental Hygiene at that time indicated an intent to utilize the Capron site as a hospital for the mentally defective. To sanction this change of purpose the Legislature at the 1950 Third Extraordinary Session on September 28, 1950 (Stats. 1951, Third Ex. Sess. 1950), enacted as an urgency measure, chapters 1 and 2. Chapters 1 and 2, Statutes, Third Extraordinary Session 1950, did not change the proposed use of the Capron tract by the state agency, the Department of Mental Hygiene, but rather changed the purpose for which the department would operate the facility from the institutionalization of mentally ill patients to one for the institutionalization of mentally defective patients. In either event the institution would be one for the care of patients suffering from some degree of mental aberration under the supervision of the Department of Mental Hygiene.

The author of these bills, Assemblyman Stanley, had previously participated in promoting the state's acquisition of the site and clearly knew of the designation of the Capron tract as a site for a state mental institution in the Budget Act of 1950 for he introduced chapters 1 and 2 at the Third Extraordinary Session of the Legislature, which granted effective legislative sanction for the use of the appropriations for the acquisition of the site, and its preliminary development, *as an institution for mental defectives*. These bills were enacted, approved, and effective on September 28, 1950, as urgency legislation introduced by Assemblyman Stanley. The stipulated judgment and order of condemnation had been entered on August 29, 1950.

Thereafter the planned construction for a hospital for institutionalization of mental defectives progressed to ultimate completion. The balance of the site not utilized for construction, approximately 350 acres, was leased for successive one-year terms to various persons including plaintiff, George Capron, from November 1, 1956, to October 31, 1958.

That portion of the Capron tract which was leased to Capron and others was the subject of various proposals for state use during the period following its condemnation. None of these proposals proved fruitful and in 1959 the Legislature by chapter 1940, Statutes of 1959, authorized the Director of Finance to sell some 357 acres of the westerly portion of the

site of Fairview Hospital which constituted slightly less than one-half of the site originally condemned. Mr. Capron assertedly learned from the newspapers that the state was going to sell this portion of the property in 1960. He thereafter filed a claim with the State Board of Control in March 1961 for rescission of the condemnation which was subsequently denied. Thereafter and on June 9, 1961, Capron and his wife caused to be filed a complaint seeking imposition of a constructive trust on the property which had been declared surplus to state needs upon the ground the August 29, 1950, judgment and decree of condemnation had been procured by reason of false representations as to the proposed public use of the site made to him by agents and employees of the state. A judgment in favor of plaintiff was entered on October 9, 1964. From this adverse determination the state appeals.

Initially, the state contends the August 1950 judgment may be collaterally attacked only for extrinsic fraud in its procurement. With the establishment of this general rule as a major premise the state next urges in the alternative no fraud was practiced in the procurement of the decree of condemnation, for (1) no false representations were proven; (2) if any were made, plaintiff did not and could not justifiably have relied upon any such representations; (3) nor were any representations, if false, made with the intent to deceive plaintiff and induce his acquiescence to the proposed settlement; (4) the plaintiff suffered no damage by reason of the fraud since he received just compensation for his property. Additionally, the state asserts the action is barred by the statute of limitations and laches, citing Code of Civil Procedure, sections 318, 338, subdivision 4.

The state correctly asserts a "final judgment of a court having jurisdiction over persons and subject matter can be attacked in equity after the time for appeal or other direct attack has expired only if the alleged fraud or mistake is extrinsic rather than intrinsic." (*Westphal* v. *Westphal,* 20 Cal.2d 393, 397 [126 P.2d 105]; *Lopez* v. *Lopez,* 63 Cal.2d 735, 738 [48 Cal.Rptr. 136, 408 P.2d 744]; *Pico* v. *Cohn,* 91 Cal. 129 [25 P. 970, 27 P. 537, 25 Am.St.Rep. 159, 13 L.R.A. 336].) Plaintiffs' cause of action is dependent upon the nature of the fraud, if any, perpetrated prior to and at the time of the stipulation and the August 1950 decree. The legally acknowledged oracle for determination of this issue may be found in *United States* v. *Throckmorton,* 98 U.S. 61 [25 L.Ed. 93] in which the United States Supreme Court defined extrinsic

fraud as the circumstance in which "the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent, . . . [enumerated examples] . . . these, and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reason for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and fair hearing." This rule is restated in the Restatement of Judgments, section 121: "Subject to general equitable considerations, equitable relief from a valid judgment will be granted to a party to the action injured thereby if the judgment was based upon a fraudulent claim or defense which he did not contest because he was (a) fraudulently misled by the other party to the action to believe that he had no claim or defense; or (b) prevented by duress from contesting it."

In accord with this general principle the courts of this state have often held that a judgment may be vacated where there has been no fair adversary trial because of extrinsic fraud or mistake. (*Olivera* v. *Grace,* 19 Cal.2d 570, 575 [122 P.2d 564, 140 A.L.R. 1328]; *Lopez* v. *Lopez, supra,* 63 Cal.2d 735, 738; *Bennett* v. *Hibernia Bank,* 47 Cal.2d 540, 558-559 [305 P.2d 20]; *Hallett* v. *Slaughter,* 22 Cal.2d 552, 557 [140 P.2d 3]; *People* v. *Ryerson,* 241 Cal.App.2d 115, 118 [50 Cal.Rptr. 246]; *Rosenbaum* v. *Estate of Tobias,* 55 Cal.App.2d 39, 43-44 [130 P.2d 215]; *Sontag* v. *Denio,* 23 Cal.App.2d 319, 323 [73 P.2d 248].) But in determining whether the prior judgment should be set aside, "It is necessary to examine the facts in the light of the policy that a party who failed to assemble all his evidence at the trial should not be privileged to relitigate a case, as well as the policy permitting a party to seek relief from a judgment entered in a proceeding in which he was deprived of a fair opportunity fully to present his case." (*Levinson* v. *Bank of America,* 126 Cal.App.2d 122, 126 [271 P.2d 632]; *Jorgensen* v. *Jorgensen,* 32 Cal.2d 13, 19 [193 P.2d 728].)

By a verified answer filed January 20, 1950, the plaintiffs failed to deny the property to be taken was being condemned for a public purpose, but they placed in issue only the reasonable value of the property to be taken.

The Division of Highways, the agency charged with the responsibility of negotiating with Capron on this condemnation, was informed by a resolution of the State Public Works Board, dated March 21, 1949, that "public interest and

necessity require the acquisition . . . by the State . . . [of the real property] . . . that the use of all of the said real property herein described for such improvement is a public use authorized by law. . . .'' This representation may have been communicated to Mr. Capron in view of his testimony that upon his trip to Sacramento he was informed by the Director of Finance, ''The State condemned it for a hospital site, so he said it was going to be condemned for an insane asylum, and the use of the land was perfectly located for their operations. It would be that they could use the inmates to keep them busy, and that seemed to help a whole lot, you know, to keep them occupied.'' It may be inferred the state's purpose in taking the entirety of the parcel was communicated to Mr. Capron. However, the Chief of the Property Acquisition Division, Department of Finance, testified that he did not recall anyone from Department of Finance, Sacramento Office negotiating with Mr. Capron regarding the acquisition of the property. In spite of this apparent conflict in the testimony, the complaint filed by the state in the eminent domain proceeding filed on June 13, 1949, contained a verbatim quotation of the resolution of the State Public Works Board, dated March 21, 1949, which declared the proposed use by the state of the property was a public use.

From Mr. Capron's testimony he was informed the property was to be used for an ''insane asylum.'' Such an institution is commonly known as one in which custody or care is provided. (*Carpenter* v. *City of New York*, 284 App.Div. 467 [132 N.Y.S.2d 153, 156].) Insanity is commonly understood to refer to one who is ''unsound in mind; of unsound mind; deranged, disordered, or diseased in mind.'' (Black's Law Dictionary, [4th Ed. 1957]).

To a layman, therefore, the fact that the property was to be condemned for use as an ''insane asylum'' would connote no other use than as a place where persons of ''unsound mind'' were to be confined and treated. The uncontradicted evidence does not disclose the plaintiffs ever questioned the purpose for which the state was to use the property during the negotiations or at the pleading stage of the proceedings. From this conduct it may be safely inferred the plaintiffs were not misled or were even interested in the potential use the state might make of the property if they received a good price for the parcel.

The state urges its action in failing to disclose the change of the intended use to be made of the site by the Department of

Mental Hygiene was at most intrinsic fraud and therefore does not justify setting aside the judgment and imposition of a constructive trust, citing *Thiriot* v. *Santa Clara etc. School Dist.*, 128 Cal.App.2d 548, 549-551 [275 P.2d 833] ; *Hamacher* v. *People*, 214 Cal.App.2d 180, 183 [29 Cal.Rptr. 513] ; *Levinson* v. *Bank of America, supra,* 126 Cal.App.2d 122, 126; *American Borax Co.* v. *Carmichael,* 123 Cal.App.2d 204, 206 [266 P.2d 531].

Plaintiffs do not evidence they were lulled into a sense of security or the acts of the state were insidious, *Colich* v. *United Concrete Pipe Corp.,* 145 Cal.App.2d 102, 106 [302 P.2d 445], or they had no opportunity to appear in court, *Levinson* v. *Bank of America, supra,* 126 Cal.App.2d 122 [271 P.2d 632] ; *Duffy* v. *Duffy,* 82 Cal.App.2d 203, 207 [186 P.2d 61], or there was any fiduciary relationship between themselves and the state or a duty owed to them as in such cases as *Carney* v. *Simmonds,* 49 Cal.2d 84, 93-94 [315 P.2d 305] ; *Bennett* v. *Hibernia Bank,* 47 Cal.2d 540, 559 [305 P.2d 20] ; *Larrabee* v. *Tracy,* 21 Cal.2d 645, 649-652 [134 P.2d 265] ; *Purinton* v. *Dyson,* 8 Cal.2d 322, 327 [65 P.2d 777, 113 A.L.R. 1230] ; *Stenderup* v. *Broadway State Bank,* 219 Cal. 593 [28 P.2d 14] ; *Campbell-Kawannanakoa* v. *Campbell,* 152 Cal. 201 [92 P. 184] ; *Silva* v. *Santos,* 138 Cal. 536 [71 P. 703] ; *Sohler* v. *Sohler,* 135 Cal. 323, 330-331 [67 P. 282, 87 Am.St.Rep. 98].

█ The conclusion of the trial court that the ''. . . representations of defendants by and through their agents to plaintiffs to use said 357 acres for agricultural purposes in connection with an 'insane asylum' and the concealment by the Department of Mental Hygiene and the Director of Finance of their intent not to use said 357 acres for any public use was bad faith on the part of the defendants and extrinsic fraud upon the plaintiffs, the court in the eminent domain action, and the other state agencies who had control of the state acquisition of the property. Said extrinsic fraud and bad faith resulted in damages to the plaintiff,'' is not binding on this court upon appellate review. In the cause at bench, though the trial court's findings of fact are supported by some evidence, the conclusion of law which the trial court drew from them may still be erroneous and thus vitiate the judgment rendered. (*Hunter* v. *Sparling,* 87 Cal.App.2d 711, 721 [197 P.2d 807] ; *D'Andrea* v. *Pringle,* 243 Cal.App.2d 689, 695 [52 Cal.Rptr. 606] ; *Stromer* v. *Browning,* *(Cal.App.) [50

---

*A hearing was granted by the Supreme Court on June 17, 1966. The final opinion of that court is reported in 65 Cal.2d 421 [55 Cal.Rptr. 18, 420 P.2d 730].

Cal.Rptr. 796].) Accordingly, it may be disregarded. (*D'Andrea* v. *Pringle, supra; Alonso* v. *Hills,* 95 Cal.App.2d 778, 789 [214 P.2d 50]; *Robinson* v. *Raquet,* 1 Cal.App.2d 533, 541 [36 P.2d 821].)

▊ In this case the evidence speaks for itself and precludes any recovery by plaintiffs. Their cause of action is barred by reason of the knowledge of Assemblyman Stanley which is imputable to plaintiffs in 1950; a point in time far in excess of the statutory period of limitations for such actions.

On March 5, 1950, Mr. Capron wrote to Stanley in part: ". . . Therefore, I authorize you on behalf of Mrs. Capron and myself to endeavor to arbitrate this matter with such State officials as may have authority in the circumstances. . . ."

Stanley had previously been active in urging the state to establish the proposed mental hospital in Orange County. Aside from his position in the Legislature, Stanley was a real estate broker. The parcel diary of the right-of-way agent introduced into evidence reflects this activity to a minor extent:

"5/24/49. Had meeting with Mr. Capron at his home in Balboa, discussed deal and made him offer of $360 M including oil rights.

"6/5/49. Mr. Stanley, Assemblyman, called me at home and discussed deal with me. I told him what had taken place at meeting with Capron.

"11/15/49. Mr. Stanley called me and we arranged a meeting at his office, Balboa Island, for 11 o'clock. I went over the deal with him and he said he was sure Capron would not accept the State's offer and had consulted an attorney. . . .

"Mr. Stanley suggested we meet with Capron and attempt to get a statement from him as to just what he will accept and then have the appraisals made to conform. I tried to diplomatically explain that that procedure would hardly be acceptable by either the Division of Highways or the Department of Finance. He then suggested he and I go out to see Dan Patch, Manager of the Orange County Fairgrounds, and find out from him who made the appraisal on their property which is situated across Harbor Boulevard from subject property, as the figures indicate the County property to be valued a $1,100 per acre while my offer amounts to $500. per acre. We saw Mr. Patch in his office and he told us Goode and Goode and Donald Jones submitted appraisals. Mr. Stanley then suggested we go

see Goode and Goode and arranged an appointment for the following day.

"11/16/49. Met Mr. Stanley at Goode and Goode in Santa Ana 9:30 a.m. We discussed the valuations and believe convinced Mr. Stanley of the soundness of the value set on Capron's property and the State offer. It was suggested Stanley call on Chester Baxter, Secretary of Orange County Title Company and advisor to Capron to advise Capron of the soundness of the State offer, and Stanley also agreed to request Capron to have an appraisal of his property made."

Other evidence introduced reflects Stanley was informed throughout as to the status and position of the state in regard to the acquisition of this tract.

Significantly, Assemblyman Stanley was an active member of the Legislature at the time the Budget Act of 1950 was introduced into the Legislature and which Act provided for sums regarding the purchase of the Capron property and set forth its use. Also, it was Assemblyman Stanley who, aware of the state's bookkeeping problem in regard to the changed proposed purpose of the parcel, sponsored chapters 1 and 2 of Statutes, 1950 Third Extraordinary Session on September 28, 1950, after the judgment of condemnation had been entered. Thereafter on November 29, 1950, Mr. and Mrs. Capron conveyed 50 percent of their one-half reserved interest in the mineral rights of one of the eight parcels composing the Capron tract to Earl W. and Mildred Stanley.

During the course of the trial, Mr. Capron testified as follows:

"Q. And did you see Earl Stanley in February or March of 1949? A. I did.

"Q. And did you find out anything from Earl Stanley at that time in regard to the fact that the State intended to take your property for a hospital? A. I did . . .

"Q. Did you know Mr. Stanley prior to your meetings in 1949? A. I did in a casual way.

"Q. When did you first become acquainted with Mr. Stanley? A. Well, he knew of my real estate and especially this piece, and I might have talked to him; but I didn't know him very well because I just moved down here and I just knew him like I would anybody else. . . .

"Q. Mr. Capron, when the State acquired your property, took your property by condemnation, prior to that time whom did you negotiate with the State, what individuals? A. As I

told you, the first time that I knew was coming from Earl Stanley. . . .

"Q. Did you give Mr. Stanley anything after your property had been acquired by the State? A. Yes.

"Q. What did you give him? A. I gave him some oil rights on the south side of the Banning property. If you have got a map here, I can show it to you. It was on my own property. You see, I had some other property than this piece, and I know that I gave him the oil rights, but not the land.

"Q. Mr. Capron, did you ever speak with Mr. Stanley concerning your property in 1958 or 1959? A. 59? Of course, I got better acquainted by that later time after '49, I got to know him fairly well. But I can't recall any specific, except he might have had another deal on for me; I can't remember that. But up to the time I knew him very little. I just moved down there and I just knew him casually.

". . . . . . . . . .

"Q. How close a friend of yours was Earl Stanley? A. Earl Stanley was not a—I knew him very casually up until he told me that he had orders to negotiate for several sites for the insane asylum."

An interdepartmental communication in evidence to James S. Dean, Chairman, State Public Works Board from the chief right-of-way agent, dated January 23, 1952, summarizes Stanley's activities:

"In view of the fact that there has been considerable gossip among informed real estate operators in the Orange County section and that the matter of the activities of Assemblyman Earl Stanley prior to and since the acquisition have been called to our attention by the Los Angeles office of the Attorney General, I deem it advisable to supply you with a complete report so that you may be fully informed in case this matter may possible be officially called to your attention.

"During the preliminary review of potential sites by the State Public Works Board and following the actual selection of the site, Assemblyman Stanley was very active in his efforts to get this transaction closed. Our records disclose that in March, 1949, Mr. Stanley had been very active in securing community interest and acceptance of this project, and during the month of March, 1949, we raised the question as to the propriety of the activities of an Assemblyman in arranging the appointment for our negotiator to meet with property owner George H. Capron and holders of other vested interests. We were, however, assured by Mr. Vincent that Assemblyman

Stanley was not acting as a broker, and in his official capacity would fully cooperate with us rather than oppose the transaction in any manner.

"In May, 1949, Mr. Stanley informed Mr. Zeeman, of our Headquarters office, that it had been his original intention to request the owner of the property to come to Sacramento. However, we advised him that this would be impractical and there were other interests to be cleared and it was our established procedure to have acquisition work of this kind performed by our Right-of-Way personnel employed in the District in which the property was located. At this time Mr. Stanley impressed upon us that he wished it understood that if at any time we encountered any difficulty and if in our opinion he could be of any help he would do everything possible to assist us.

"In your files under date of September 19, 1949, you will find a letter addressed to Earl W. Stanley, 9 Beacon Bay, Balboa Island, California, signed by H. C. Vincent, Jr., in which Mr. Vincent supplied Mr. Stanley with full information relative to the then status of the negotiations.

"Under date of July 6, 1950, this office transmitted to you Inter-Department Communication to the attention of H. C. Vincent, signed by J. T. Zeeman, transmitting the stipulation covering settlement and other necessary papers to close the transaction and outlining full terms and conditions.

"During the entire period referred to above, our negotiator from the District VII Office in Los Angeles and Headquarters Right-of-Way Agent, J. T. Zeeman, had numerous conferences with the State's grantors, and in some of these conferences Mr. Stanley appeared prominently. The primary purpose of all such conferences was an effort on the part of our negotiators to clear out the underlying oil and mineral rights which the owners insisted upon reserving, but which rights the State Public Works Board had instructed us to acquire. We finally reached a compromise settlement in the Final Order and the Decree of Condemnation as to Parcels 1 through 7, inclusive, of said case dated August 29, 1950, provides among other matters that the defendant owners were to reserve unto themselves all oil and mineral rights, together with certain easements for drilling sites 130 feet wide and 400 feet long, which sites were to be parallel with and contiguous to either the northerly or southerly boundary lines of Parcels 1, 3, 4, 5, and 6.

"For your further information, I am transmitting herewith

original and two copies of report submitted to me under date of January 16, 1952, by Chief Right-of-Way Agent E. F. Wagner, together with attachments including copy of report submitted to Mr. Wagner under date of January 4, 1952, by J. F. Walsh, Senior Right-of-Way Agent and Chief Title Examiner in our District VII Office, which report contains a complete chronological history of Parcels 1 to 7 inclusive, together with other documentary evidence, and I call your particular attention to the record which shows that by deed dated November 29, 1950, and recorded December 5, 1950, in Book 2111, Page 5, Official Records of Orange County, George H. Capron and Ednah Race Capron, husband and wife, conveyed to Earl W. Stanley and Mildred Stanley, husband and wife, one-half of the grantors' interest in all oil rights in and to the south 1,605 feet of Parcel 5. This deed had the effect of vesting in Earl W. Stanley and Mildred Stanley an undivided ¼ interest in the oil rights to said south 1,605 feet of Parcel 5, which area is shown colored in red on the map attached to Mr. Walsh's memorandum.

"Please understand we are not submitting this report to you in the spirit of accusing anyone connected with the transaction of improper actions, but for the sole purpose of supplying you, as Chairman of the State Public Works Board, a full chronological history of this transaction in case the rumors that are floating around in Orange County should be officially called to your attention."

Thus, plaintiffs are precluded from any recovery since they, through Stanley, were aware of the change of purpose of the state's intended use of the property prior to 1959. Capron in early 1950 asked Stanley to "arbitrate" with responsible state officials on behalf of his wife and himself concerning the price they were to receive for this property. Stanley did not refuse or in any manner indicate he would not do so. As such, he was an agent of the Caprons for the purpose of effecting a successful conclusion to the negotiations between the state and plaintiffs. (Civ. Code, §§ 2295, 2297; Rest. 2d Agency, §§ 1 and 3; *Store of Happiness* v. *Carmona & Allen, Inc.*, 152 Cal.App.2d 266, 269 [312 P.2d 1104]; *Cronin* v. *Coyle*, 6 Cal.App.2d 205, 208-212 [44 P.2d 385]).

■ Assuming *arguendo*, even though plaintiffs, the Caprons, may not be chargeable with knowledge of the change of purpose, which we do not concede, within a matter of one month after the entry of the judgment of condemnation, plaintiffs' agent, Assemblyman Stanley, took affirmative

action by the introduction of chapters 1 and 2, *supra*, which legislatively changed the purpose for which the state would use the Capron property.

Since Stanley sponsored the two chapters of the change of purpose statutes in September 1950, his knowledge is imputable to the Caprons, his principals. (Civ. Code, § 2332; *Benner* v. *Hooper*, 112 Cal.App. 53, 62-63 [296 P. 660]; *Hanlon* v. *Western Loan & Bldg. Co.*, 46 Cal.App.2d 580, 596 [116 P.2d 465]; *Laukkare* v. *Abramson*, 9 Cal.App.2d 447, 449 [50 P.2d 478].) Stanley's knowledge, arising either before or during the agency, concerned the subject of the agency and was within its scope. (*Herzog* v. *Capital Co.*, 27 Cal.2d 349, 353 [164 P.2d 8]; *Sanders* v. *Magill*, 9 Cal.2d 145, 153-154 [70 P.2d 159].) By the evidence there was a sufficient lapse of time for this knowledge to have been communicated to the Caprons, *Kelley* v. *British Coml. Ins. Co., Ltd.*, 221 Cal.App. 2d 554, 561 [34 Cal.Rptr. 564], and hence the Caprons are chargeable with their agent's knowledge. (*Kelley* v. *British Coml. Ins. Co., Ltd.*, supra, 221 Cal.App.2d 554, 561-562; *Granberg* v. *Turnham*, 166 Cal.App.2d 390, 395 [333 P.2d 423]; *Columbia Pictures Corp.* v. *DeToth*, 87 Cal.App.2d 620, 630 [197 P.2d 580]; Rest.2d Agency, § 278.) ▮ Since this knowledge may be imputed to the Caprons in 1950 through their agent, their cause of action is now barred by the provisions of Code of Civil Procedure, section 338 subdivision 4. (*Shonts* v. *Hirliman* (S. D. Cal. 1939) 28 F.Supp. 478, 485-486; *Hartley Pen Co.* v. *Lindy Pen Co.* (S. D. Cal. 1954) 16 F.R.D. 141, 158, aff. 237 F.2d 294, 301; *Bainbridge* v. *Stoner*, 16 Cal.2d 423, 429-430 [106 P.2d 423]; *Security-First Nat. Bank* v. *Ross*, 214 Cal.App.2d 424, 430 [29 Cal.Rptr. 538]; *Snook* v. *Netherby*, 124 Cal.App.2d 797, 800-802 [269 P.2d 195].)

Additionally, after Caprons' agent had knowledge of the change of purpose and Caprons had transferred to their agent a portion of the mineral rights, and after the state put to use part of the original Capron tract, plaintiffs were aware that the state had leased part of the property to third parties and to themselves. This action by the state continued for at least nine years before plaintiffs allege they were aware of the extrinsic fraud. Plaintiffs allege it was only when the property was declared surplus in 1960 that they learned of the purported fraud practiced upon them in 1950.

▮ Seemingly plaintiffs, by innuendo, seek to assert the officials of the state, thereby the state itself, conspired against

plaintiffs to gain possession of a large tract of land knowing only a part would be used, thereby giving the state control of a large tract which could later be sold at a profit. In other words, the state conspired to obtain plaintiffs' land on a speculative basis. There is no substance to this illusionary position for there is no evidence of acts, conduct or events prior or subsequent to the stipulation and judgment to support it. The evidence is affirmatively to the contrary. The final determination as to its use was not based or determined upon such speculative acquiring or holding of the Capron land. Also, for nine years after the acquisition of the Capron land, the state sought to use the land for state purposes. After, and only after nine years, was there a determination to declare the land surplus. Such explorations standing alone in these circumstances would be sufficient evidence to refute such conspiratorial charges.

Judgment reversed.

Kerrigan, J., concurred.

Tamura, J., did not participate therein.

A petition for a rehearing was denied January 5, 1967. Tamura, J., did not participate therein. Respondents' petition for a hearing by the Supreme Court was denied February 8, 1967.